IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 15-cv-1775-WJM-MJW

ERIC VERLO,
JANET MATZEN, and
FULLY INFORMED JURY ASSOCIATION,

          Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, COLORADO, a municipality,
ROBERT C. WHITE, in his official capacity as chief of police for Denver, and
CHIEF JUDGE MICHAEL MARTINEZ, in his official capacity as chief judge of the
Second Judicial District,

          Defendants.

---

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

---

        Plaintiffs Eric Verlo, Janet Matzen, and the Fully Informed Jury Association

("FIJA") (collectively, "Plaintiffs") bring this lawsuit to establish that they have a First

Amendment right to distribute and discuss literature regarding jury nullification in the

plaza outside of Denver's Lindsey-Flanigan Courthouse ("Courthouse Plaza" or

"Plaza").  (ECF Nos. 1, 13-1.)  The Lindsey-Flanigan Courthouse is where most criminal

proceedings take place for Colorado's Second Judicial District (which is coterminous

with the City and County of Denver).

        Plaintiffs have sued the City and County of Denver itself and its police chief,

Robert C. White, in his official capacity (jointly, "Denver").  Plaintiffs have also sued the

Hon. Michael A. Martinez[1] in his official capacity as Chief Judge of the Second Judicial District.  Out of recognition that Plaintiffs' lawsuit does not target Chief Judge Martinez himself but rather a policy promulgated by the Second Judicial District through Chief Judge Martinez, the Court will refer below to Chief Judge Martinez as "the Second Judicial District."

On the same day Plaintiffs filed their complaint, they also moved for a preliminary injunction to restrain Defendants from taking any action to stop them from distributing certain literature regarding, or advocating for, jury nullification on the Courthouse Plaza ("Motion").  (ECF No. 2.)  The Second Judicial District, represented by the Colorado Attorney General's office, filed a response defending its current policy of limiting expressive activities to certain areas away from the main walkways leading to the Courthouse doors.  (ECF No. 24.)  Denver, represented by the Denver City Attorney's office, did not file a response, but instead filed a joint stipulation with Plaintiffs regarding the status of the Plaza.  (ECF No. 23.)  As discussed further below, Denver (a) has no intent to enforce the Second Judicial District's policy that would otherwise restrict Plaintiffs' activities, and (b) agrees with Plaintiffs that they have a First Amendment right to distribute and discuss their literature essentially anywhere on the Courthouse Plaza, including in the areas designated as restricted by the Second Judicial District.

This Court held an evidentiary hearing and heard oral argument on August 21, 2015.  Having considered all of the filings, evidence, and arguments submitted to date,

---

[1] No relation to the undersigned.

the Court grants Plaintiffs' Motion for the reasons explained below.

## I.  LEGAL STANDARD

To prevail on a motion for preliminary injunctive relief, Plaintiffs have the burden of establishing that four equitable factors weigh in their favor: (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) their threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *See Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009); *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

## II.  BACKGROUND

### A.    Facts Alleged in the Original Complaint

Plaintiffs' original complaint recounts the story of two non-parties, Mark Iannicelli and Eric Brandt, who were passing out pamphlets on the Courthouse Plaza on July 27, 2015.  (ECF No. 1 ¶ 14.)  The pamphlets were titled "Fresh Air for Justice" and "Your Jury Rights: True or False?"  (*Id.* ¶ 15; ECF No. 1-3; ECF No. 1-4.)  Both pamphlets contain some history of jury nullification and various general statements about the jury's role as envisioned by the Framers.  (*See generally* ECF Nos. 1-3, 1-4.)  But the pamphlets also contain certain calls to action which could raise concern.  "Fresh Air for Justice," for example, contains the following:

- "Judges say the law is for them to decide.  That's not true.  When you are a juror, you have the right to decide both law and fact."  (ECF No. 1-3 at 3.)

- "If the law violates any human rights, you **must vote no** against that law by voting 'not guilty.'" (*Id.* (emphasis in original).)

"Fresh Air for Justice" also contains the following, which could be interpreted as encouraging prospective jurors to lie during voir dire:

> When you are called for jury duty, you will be one of the few people in the courtroom who wants justice rather than to win or to score career points.  For you to defend against corrupt politicians and their corrupt laws, you must get on the jury.  During the jury selection, prosecutors and judges often work together to remove honest, thinking people from juries.
>
> When you're questioned during jury selection, just say you don't keep track of political issues.  Show an impartial attitude.  Don't let the judge and prosecutor stack the jury by removing all the thinking, honest people!
>
> Instructions and oaths are designed to bully jurors and protect political power.  Although it all sounds very official, instructions and oaths are not legally binding, or there would be no need for independent thinking jurors like you.

(*Id.* at 4.)

The other pamphlet, "Your Jury Rights: True or False?", does not contain language quite as direct as the foregoing, but it does declare, "You cannot be forced to obey a 'juror's oath.'"  (ECF No. 1-4 at 3.)

Iannicelli was arrested on the Plaza that day, and Brandt was arrested on a warrant a few days later.  (ECF No. 1 ¶ 18.)  Both were charged with jury tampering: "A person commits jury-tampering if, with intent to influence a juror's vote, opinion,

4

decision, or other action in a case, he attempts directly or indirectly to communicate

with a juror other than as a part of the proceedings in the trial of the case."  Colo. Rev.

Stat. § 18-8-609(1).  The affidavit supporting Brandt's arrest mentions that he and

Iannicelli had been on the Courthouse Plaza at a time that jurors "would be expected to

be arriving" for the ongoing death penalty prosecution of Dexter Lewis.  (ECF No. 1-2

at 4.)[2]

Plaintiff Eric Verlo "wishes to pass out the same literature on the

Lindsey-Flannigan [*sic*; 'Flanigan'] plaza as Eric Brandt and Mark Iannicelli were

passing out which caused them to be arrested."  (ECF No. 1 ¶ 9.)  Plaintiff Janet

Matzen wishes to do the same.  (*Id.* ¶ 10.)  Plaintiff FIJA is

> an association, based in Montana, who's [*sic*] members
> passionately believe in the concept of jury nullification.  FIJA
> intends to hold an educational campaign in Denver on
> September 5, 2015 where its members wish to pass out the
> same brochures on the Lindsey-Flannigan [*sic*] plaza as Eric
> Brandt and Mark Iannicelli . . . .

(*Id.* ¶ 11.)[3]  Plaintiffs say that the arrests of Brandt and Iannicelli have caused them to

fear that they too might be arrested and prosecuted.  (*Id.* ¶ 22.)

## B.    Facts Alleged in the Amended Complaint & Supplemental Filings

Two days after filing suit, Plaintiffs filed an amended complaint to insert

---

[2] Lewis was charged with murdering five individuals at a Denver bar in 2012.  *See, e.g.*, Jordan Steffen & Matthew Nussbaum, "Denver jury hears opening arguments in five Fero's bar killings," Denver Post (July 20, 2015), *at* http://www.denverpost.com/news/ci_28513519/ denver-jury-hears-opening-arguments-five-feros-bar (last accessed Aug. 24, 2015).

[3] September 5, 2015, is a Saturday—an unlikely day for a jury nullification advocate to reach his or her target audience at a courthouse.  When this was pointed out at the preliminary injunction hearing, counsel for Plaintiffs qualified the date with an "on or about."

allegations regarding a Second Judicial District administrative order recently posted on the Courthouse doors.  (ECF No. 13-1 ¶ 2.)  The order, designated "CJO 15-1" and dated August 14, 2015, was titled "Chief Judge Order Regarding Expressive Activities at the Lindsey-Flanigan Courthouse."  (ECF No. 24-1.)  This order was actually amended on August 21, 2015, hours before the preliminary injunction hearing in this Court, and admitted as Exhibit 1 in that hearing.  (*See* ECF No. 25-1.)  The Court will refer to the amended order as the "Plaza Order."  In relevant part, it reads as follows:

> The Court has the responsibility and authority to ensure the safe and orderly use of the facilities of the Second Judicial District; to minimize activities which unreasonably disrupt, interrupt, or interfere with the orderly and peaceful conduct of court business in a neutral forum free of actual or perceived partiality, bias, prejudice, or favoritism; to provide for the fair and orderly conduct of hearings and trials; to promote the free flow of pedestrian and vehicular traffic on sidewalks and streets; and to maintain proper judicial decorum.  Those having business with the courts must be able to enter and exit the Lindsey-Flanigan Courthouse freely, in a safe and orderly fashion and unhindered by threats, confrontation, interference, or harassment. Accordingly, the Court hereby prohibits certain expressive activities on the grounds of the Courthouse, as depicted in the highlighted areas of the attached map [reproduced below], without regard to the content of any particular message, idea, or form of speech.
>
> **Prohibited Activities:** The activities listed below shall be prohibited in the following areas: anywhere inside the Lindsey-Flanigan Courthouse, including courtrooms, corridors, hallways, and lobbies; the areas, lawns, walkways, or roadways between the Courthouse and public sidewalks and roads; and any areas, walkways, or roadways that connect public sidewalks and roads to Courthouse entrances or exits. This includes the Courthouse entrance plaza areas on the east and west sides of the Courthouse as depicted in the highlighted areas of the attached map.
>
> **1.     Demonstrating; picketing; protesting; marching;**

6

parading; holding vigils or religious services; proselytizing or preaching; distributing literature or other materials, or engaging in similar conduct that involves the communication or expression of views or grievances; soliciting sales or donations; or engaging in any commercial activity; unless specifically authorized in writing by administration;

2.  Obstructing the clear passage, entry, or exit of law enforcement and emergency vehicles and personnel, Courthouse personnel, and other persons having business with the courts through Courthouse parking areas, entrances, and roadways to and from Courthouse and Courthouse grounds;

3.  Erecting structures or other facilities, whether for a single proceeding or intended to remain in place until the conclusion of a matter; or placing tents, chairs, tables, or similar items on Courthouse grounds; except as specifically authorized in writing by administration; and

4.  Using sound amplification equipment in a manner that harasses or interferes with persons entering or leaving Courthouse grounds or persons waiting in line to enter the Courthouse.

(*Id.* at 1–2 (formatting in original).)  The Court will refer to the Plaza Order's numbered paragraphs by their number, *e.g.*, "Paragraph 1 of the Plaza Order" (referring to the forms of prohibited expressive activity).  In their amended complaint, Plaintiffs allege that the Plaza Order was "apparently" entered in response to Brandt's and Iannicelli's actions.  (ECF No. 13-1 ¶ 2.)

The "attached map" referenced in the Plaza Order is reproduced on the following page:



(*Id.* at 3.)  This map shows an aerial view of the Courthouse.  The top of the map is

north.  The Courthouse itself is the irregularly shaped, white-roofed building occupying

the left half of the map.  Immediately to the left (west) of the Courthouse is Fox Street.

Immediately to the north is Colfax Avenue.  Immediately to the right (east) of the

Courthouse grounds is Elati Street, which is closed to traffic other than police vehicles as it runs past the Courthouse.  Elati bisects a circular area paved in a tan color.  Just to the right (east) of Elati, and not depicted in the map, is Denver's Van Cise-Simonet Detention Center ("Detention Center"), which houses pretrial detainees.  Thus, the area between the Courthouse and Detention Center is a fairly spacious place suitable for public gatherings.

Immediately to the east and west of the Courthouse are areas that the Second Judicial District highlighted in yellow to indicate where expressive activity is restricted ("Restricted Area").  This matter principally concerns the arc-shaped portion of the Restricted Area to the east of the Courthouse ("East Restricted Area").  The East Restricted Area comprises the following:

- planter boxes and public art (collectively, "Landscaping");
- sidewalks, including a narrow sidewalk beginning at the north of the map (just below the blue bus stop icon) and following the arc of the planter boxes until it reaches a much wider sidewalk that completes the arc, which itself connects with the awning-covered steps leading to the Courthouse front doors depicted in approximately the center of the map (collectively, "Sidewalks"); and
- a gravel passive security feature between the narrow sidewalk and the Courthouse itself ("Gravel Area").

**C.   Evidence Received at the Preliminary Injunction Hearing**

1.   <u>Commander Lopez</u>

Plaintiffs called as a witness Commander Antonio Lopez of the Denver Police

Department.  Lopez oversees the Denver Police district that encompasses the Courthouse and the Detention Center.  Lopez testified that the Courthouse opened in 2010 or 2011.  During that time, he has seen "more protests [in the area between the Courthouse and the Detention Center] than [he can] recall.  At one point w e were averaging about two or three a week, in that area."  On cross-examination, Lopez clarified that most of those protests were nearer to the Detention Center than the Courthouse.  Nonetheless, to Lopez's knowledge, the Denver Police Department has never restricted or interfered with any peaceful First Amendment activity taking place between the Courthouse and the Detention Center.

2.   Mr. Steadman

The Second Judicial District called Steven Steadman, who is the Colorado judicial branch's security administrator.  Steadman was closely involved in the discussions leading up to the Plaza Order.  Steadman testified that, during those discussions, he was unaware of Brandt and Iannicelli or the distribution of jury nullification literature, and that the Plaza Order actually arose from very different concerns.

According to Steadman, discussions began with Chief Judge Martinez in early July 2015 because the Dexter Lewis trial was scheduled to overlap with another death penalty trial in Arapahoe County, *i.e.*, the trial of Aurora theater shooter James Holmes. Steadman and Chief Judge Martinez specifically worried about potentially violent protests that might break out if Lewis (who is black) eventually received the death penalty but Holmes (who is white) did not.  Proactively seeking to avoid such a problem, Steadman gave Chief Judge Martinez a copy of an order entered by the Hon. Carlos A.

10

Samour, Jr., who presided over the Holmes trial in Arapahoe County.  Judge Samour's

order apparently was a model for what the Second Judicial District eventually issued as

the Plaza Order.

On cross-examination, Steadman confirmed that the Plaza Order was intended

specifically to address the protests that might erupt if Holmes and Lewis were treated

differently with respect to the death penalty.  Steadman admitted, however, that his

office could require several hours' notice between the announcement that the jury had

reached a verdict and the actual reading of the verdict, which would permit a police

presence to assemble in anticipation of protests.  Steadman also admitted that nothing

like the Plaza Order had been in place or enforced prior to August 14, 2015, and that

passing out jury nullification literature did not present any security risk beyond what the

Second Judicial District has tolerated, without incident, since the Courthouse opened.

## III.  ANALYSIS

### A.    Article III Standing

As mentioned previously, Denver has stipulated with Plaintiffs that it will not

enforce any prohibition on distributing jury nullification literature on the Courthouse

Plaza.  Specifically, Denver has stipulated that

> Plaintiffs who wish to engage in peacefully passing out jury
> nullification literature to passersby on the Plaza are entitled
> to do so and that Denver, through its police or sheriff
> department, will not arrest or otherwise charge Plaintiffs for
> handing out literature regarding jury nullification so long as
> Plaintiffs do not violate Colorado law or Denver's Revised
> Municipal Code when they are handing out their literature.
> The parties stipulate that Plaintiffs' proposed intent of
> peacefully handing out jury nullification literature to or
> discussing jury nullification with passersby at the Plaza,

without more, does not violate Colorado law. . . .

* * *

. . . Denver stipulates that it does not intend to enforce the [Plaza] Order as written and will only impose content and viewpoint neutral reasonable time, place and manner restrictions on the use of the Plaza, and/or other exterior areas surrounding the Plaza if Denver determines that a compelling need exists to do so.

(ECF No. 23 ¶¶ 2, 4.)

Given this stipulation, the Second Judicial District argues that Plaintiffs lack Article III standing to bring this lawsuit because no threat of enforcement is imminent. (ECF No. 24 at 6–8.)  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("the irreducible constitutional minimum of standing" includes, among other things, an "actual or imminent" "invasion of a legally protected interest"); *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009) (to obtain prospective relief, a plaintiff must show a "credible threat of future prosecution").  As stated at the preliminary injunction hearing, however, the Court rejects this contention.

The Second Judicial District's standing argument assumes that the only way an individual could run afoul of the Plaza Order is through Denver's independent enforcement efforts.  But Chief Judge Martinez, and perhaps any other judge in the Second Judicial District, could issue a contempt citation for violating the Plaza Order. *Cf. Schmidter v. State*, 103 So. 3d 263, 265–69 (Fla. Dist. Ct. App. 2012) (distributor of FIJA literature convicted of contempt for violating an administrative order similar to the Plaza Order).  The violator would then be required to appear before the issuing judge, and if he or she fails to appear, an arrest warrant can issue.  *See* Colo. R. Civ. P.

12

107(c).  Denver may then be obligated to arrest the violator—not on the authority of the

Plaza Order, but on the authority of the judge's contempt citation.  *See id.* (requiring the

sheriff to carry out the arrest).  The Court takes judicial notice of the fact that Colorado

state law enforcement officers, not subject to Denver's stipulation, could also effect the

arrest of such a hypothetical violator.

Thus, the Court finds that Article III standing still exists, and the Court will move

on to the elements Plaintiffs must establish to secure a preliminary injunction.  To

repeat, those elements are: (1) likelihood of success on the merits; (2) irreparable injury

if the injunction is denied; (3) the threatened injury outweighs the injury the opposing

party will suffer under the injunction; and (4) the injunction would not be adverse to the

public interest.  *Westar Energy*, 552 F.3d at 1224.

## B.    Likelihood of Success

Evaluating the likelihood of success requires evaluating the substantive merit of

Plaintiffs' claim that the First Amendment grants them a right to discuss and distribute

pamphlets about jury nullification with individuals entering and leaving the Courthouse.

To answer this question, the Supreme Court prescribes the following analysis:

1.    Is the expression at issue protected by the First Amendment?

2.    If so, is the location at issue a traditional public forum, a designated public

forum, or a nonpublic forum?

3.    If the location is a traditional or designated public forum, is the

government's speech restriction narrowly tailored to meet a compelling

state interest?

13

4.      If the location is a nonpublic forum, is the government's speech restriction

reasonable in light of the purpose served by the forum, and viewpoint

neutral?

*See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797–806 (1985).

The Court will address these inquiries in turn.

1.      Does the First Amendment Protect Plaintiffs' Pamphlets and Oral
        Advocacy of the Message Contained in the Pamphlets?

The Court "must first decide whether [the speech at issue] is speech protected

by the First Amendment, for, if it is not, we need go no further." *Id.* at 797. There

appears to be no contest on this point. The Second Judicial District has raised no

argument that any part of the message conveyed by the pamphlets is unprotected by

the First Amendment. Accordingly, the Court deems it conceded for preliminary

injunction purposes that Plaintiffs are likely to succeed on the question of whether the

First Amendment protects their message.

2.      Is the Courthouse Plaza a Public Forum?

The Court must next decide whether the Courthouse Plaza—and the Restricted

Area specifically—is a public or nonpublic forum:

> . . . the extent to which the Government can control access
> [to government property for expressive purposes] depends
> on the nature of the relevant forum. Because a principal
> purpose of traditional public fora is the free exchange of
> ideas, speakers can be excluded from a public forum only
> when the exclusion is necessary to serve a compelling state
> interest and the exclusion is narrowly drawn to achieve that
> interest. Similarly, when the Government has intentionally
> designated a place or means of communication as a public
> forum speakers cannot be excluded without a compelling
> governmental interest. Access to a nonpublic forum,
> however, can be restricted as long as the restrictions are

> reasonable and are not an effort to suppress expression
> merely because public officials oppose the speaker's view.

*Id.* at 800 (citations and internal quotation marks omitted; alterations incorporated).

The public/nonpublic inquiry presents a unique dilemma in this case.  On the one hand, Denver's stipulation with Plaintiffs includes the following: "The Lindsey-Flanigan plaza . . . which is located between the Van Cise-Simonet Detention Center and the Lindsey-Flanigan courthouse *is a public forum* and any content-based regulations must be narrowly drawn to effectuate a compelling state interest . . . ."  (ECF No. 23 ¶ 1 (emphasis added).)  On the other hand, the Second Judicial District strongly disagrees:

> . . . Plaintiffs assert that the courthouse plaza is a traditional public forum, and therefore maintain that Chief Judge Martinez's administrative order must be strictly scrutinized. As a matter of state law, however, Chief Judge Martinez— and not Denver—is responsible for the oversight of the courthouse and the adjoining grounds.  Thus, any concession on this point by Denver binds neither the parties nor this Court.

(ECF No. 24 at 8.)  Apparently a minor turf war has erupted between Denver and the Second Judicial District over control of the Courthouse grounds.

When asked at the preliminary injunction hearing regarding the "state law" that gives Chief Judge Martinez "responsib[ility] for the oversight of the courthouse and the adjoining grounds," counsel for the Second Judicial District directed the Court to Colorado Revised Statutes § 13-3-108(1).  That subsection reads: "The board of county commissioners in each county shall continue to have the responsibility of providing and maintaining adequate courtrooms and other court facilities including janitorial service, except as otherwise provided in this section."  Neither this language, nor anything else in § 13-3-108, appears to relate to a chief judge's authority over courthouse policies or

15

courthouse grounds.

Counsel for the Second Judicial District also pointed this Court to *State ex rel. Norton v. Board of County Commissioners of Mesa County*, 897 P.2d 788 (Colo. 1995) ("*Mesa County*").  In *Mesa County*, the county commissioners defied an order from the Twenty-First Judicial District's chief judge requiring additional security measures at the county courthouse.  *See Mesa County*, 897 P.2d at 789.  The county commissioners further announced their intent to stop providing support of any kind to the Twenty-First Judicial District, arguably in violation of § 13-3-108(1) (quoted above), Colorado Revised Statutes § 13-1-114(2) (requiring county sheriffs to assist the judiciary when the judiciary perceives a "risk of violence in the court"), and Colorado Revised Statutes § 30-11-104(1) (requiring each county to "provide a suitable courthouse").  *See id.*  The county commissioners believed that Colorado's constitutional Taxpayers' Bill of Rights allowed the county to disregard the foregoing statutes because they created an impermissible "subsidy" to the court system.  *Id.* at 789–90.  The Colorado Supreme Court rejected the county commissioners' position and held that counties' statutory duties toward the court system are not "subsidies" under the Taxpayers' Bill of Rights. *Id.* at 791.

The *Mesa County* decision highlights the relationship between counties and the state courts that sit within them.  It emphasizes county sheriffs' duties to assist judges in preventing "violence in the court."  Colo. Rev. Stat. § 13-1-114(2).  It does not support the Second Judicial District's notion that it controls and can speak for the status of the Courthouse grounds.

Finally, counsel for the Second Judicial District cited this Court to *In re Court Facilities for Routt County*, 107 P.3d 981 (Colo. App. 2004) ("*Routt County*").  *Routt County* held that, under certain circumstances, a state judicial district's chief judge has inherent authority to order the board of county commissioners to design and pay for a new courthouse.  *Id.* at 984.  Quoting *Peña v. District Court*, 681 P.2d 953, 956 (Colo. 1984), *Routt County* relied on the notion that "courts necessarily possess certain inherent powers, which . . . consist of 'all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence, and integrity, and to make its lawful actions effective.'"  *Routt County*, 107 P.3d at 984.

Both *Routt County* and *Peña* specifically address the Colorado judiciary's inherent authority to order another state or municipal entity to spend money on the judiciary's behalf.  That power is not at issue here.  Nonetheless, the inherent authority described in *Routt County* and *Peña* could conceivably also extend to entering orders such as the Plaza Order.  The ultimate question, however, is whether Denver or the Second Judicial District speaks for the First Amendment status of the Courthouse Plaza.  For at least three reasons, the Court concludes that Plaintiffs are likely to prevail against the Second Judicial District on that question.

First, counsel for the Second Judicial District agrees that Denver owns the Courthouse itself and all of its grounds.

Second, counsel for the Second Judicial District further stated that there was no lease agreement of which he was aware between Denver and the Second Judicial District.  Rather, the Second Judicial District occupies the Courthouse "as provided by

17

law."

Third, it is undisputed that the Second Judicial District is not the Courthouse's

sole occupant.  Denver County Court also sits in the Courthouse.  Denver County Court

is unique among county courts in Colorado because the Colorado Constitution grants

Denver the authority to set the "number, manner of selection, qualifications, term of

office, tenure, and removal of [its] judges."  Colo. Const. art. VI, § 26.  Moreover, a

Chief Justice Directive from the chief justice of the Colorado Supreme Court states that

"[t]he chief judge of the Second Judicial District shall not have administrative authority

over the Denver County Court."  CJD 95-01, Preamble (amended Aug. 17, 2012),

*available at* https://www.courts.state.co.us/Courts/Supreme_Court/Directives/

95-01amended8-17-12.pdf.  Thus, there are two distinct judicial bodies operating in the

Courthouse, and the Second Judicial District apparently cannot speak for both.

For all these reasons, the Court finds that Plaintiffs are likely to prevail in their

contention that Denver controls and speaks for the Courthouse Plaza.[4]  Because

Denver has stipulated that the Courthouse Plaza is a public forum, Plaintiffs are

likewise likely to prevail in their claim that the Courthouse Plaza is at least a designated

public forum, if not a traditional public forum.  *See Cornelius*, 473 U.S. at 800.[5]

---

[4] Ultimately, a Colorado state court may need to resolve this question.  *See, e.g.*, CJD 95-01 ¶ 15 ("Any disputes arising from the exercise of the authority described in this directive shall be resolved by the Chief Justice.").  In this posture, however, the Court need only conclude that Plaintiffs are likely to succeed.

[5] If the Courthouse Plaza is indeed a public forum, it would be unique in that respect. The parties have not cited, nor could the Court find, a single case in which courthouse grounds were deemed a public forum.  *Cf. Huminski v. Corsones*, 396 F.3d 53, 90–91 (2d Cir. 2005) (courthouse grounds not a public forum); *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966 (9th Cir. 2002) (same), *abrogated on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008); *Comfort v. MacLaughlin*, 473 F. Supp. 2d 1026, 1028 (C.D. Cal. 2006) (same);

Moreover, the Court notes that the Second Judicial District has not specifically argued for a finding that the Courthouse Plaza is a nonpublic forum.  Rather, it says that "resolving [the type of forum at issue] is not necessary for the purposes of this proceeding because [the Plaza Order] would satisfy even the strictest test."  (ECF No. 24 at 9.)  Thus, the Court turns to the question of whether the Plaza Order can survive a strict scrutiny analysis.[6]

   3.   Is the Plaza Order Narrowly Tailored to Serve a Significant Government Interest, and Does it Leave Open Ample Alternative Means of Communication?

   "In [a] quintessential public forum[], the government may not prohibit all communicative activity."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also id.* at 46 (holding that the government may un-designate a designated public forum, but until it does so, "it is bound by the same standards as apply in a traditional public forum").  The state may, however, "enforce regulations of the time, place, and manner of expression which [1] are content-neutral, [2] are narrowly tailored to serve a significant government interest, and [3] leave open ample alternative channels of communication."  *Id.*  The Court will address each element in turn as it applies to the Plaza Order.

---

*Schmidter*, 103 So. 3d at 270 (same).

   [6] The ensuing analysis assumes, of course, that the Second Judicial District may attempt to enforce the Plaza Order through its own contempt power.  If such power did not exist, there would likely be no reason to scrutinize the Plaza Order under any constitutional standard given Denver's control over the Plaza and its stipulation not to interfere with Plaintiffs' intended activities.  (*See* Part III.A, *supra*.)

a.     *"Content-Neutral"*

The Plaza Order applies "without regard to the content of any particular

message, idea, or form of speech."  (ECF No. 25-1 at 1.)  On its face, then, it appears

content-neutral.  Plaintiffs have not argued otherwise.

b.     *"Narrowly Tailored to Serve a Significant Government Interest"*

The Plaza Order itself asserts several interests:

> . . . to minimize activities which unreasonably disrupt,
> interrupt, or interfere with the orderly and peaceful conduct
> of court business in a neutral forum free of actual or
> perceived partiality, bias, prejudice, or favoritism; to provide
> for the fair and orderly conduct of hearings and trials; to
> promote the free flow of pedestrian and vehicular traffic on
> sidewalks and streets; and to maintain proper judicial
> decorum . . . .

(*Id.*)  However, in response to Plaintiffs' Motion, the Second Judicial District has only

defended the Plaza Order on the bases of preserving "the efficient functioning of the

court" (*e.g.*, unhindered ingress and egress to the Courthouse) and "maintain[ing]

public safety."  (ECF No. 24 at 12.)

These are potentially "significant" government interests.  Legitimate time-place-

manner restrictions in a public forum can be motivated by "objectives [such as] public

safety, accommodating competing uses of the easement, controlling the level and times

of noise, and similar interests."  *First Unitarian Church of Salt Lake City v. Salt Lake

City Corp.*, 308 F.3d 1114, 1132 (10th Cir. 2002).  But the Court finds on this record

that Plaintiffs are likely to succeed in proving that the Plaza Order is not narrowly

tailored to these stated objectives.  Paragraph 1 of the Plaza Order bans essentially all

expressive activity regardless of whether it would affect "the efficient functioning of the

court" or threaten "public safety."  Courts look dimly on such "First Amendment Free

Zones."  *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*,

482 U.S. 569, 574 (1987); *First Unitarian*, 308 F.3d at 1132.

Moreover, in the Second Judicial District's briefing (*see* ECF No. 24 at 12) and at

the preliminary injunction hearing, it became clear that the sole motivating concern

behind the Plaza Order was potentially violent protests that could follow if Dexter Lewis

receives the death penalty.  Steadman, the Second Judicial District's witness, agreed

that other measures could address that concern, *e.g.*, he could arrange for additional

security well in advance of any verdict announcement.  He also agreed that Plaintiffs'

activities posed no greater threat to the Courthouse than it has faced in the last five

years, when expressive activities have been unrestricted.  Thus, the Court finds that

Plaintiffs will likely demonstrate that at least Paragraph 1 of the Plaza Order is not

narrowly tailored to serve the interests of maintaining public safety and the efficient

functioning of the court.

c.      *"Leave Open Ample Alternative Channels of Communication"*

Given the foregoing finding, inquiry into the alternative channels of

communication is unnecessary.[7]  The Court accordingly holds that Plaintiffs are likely to

---

[7] The Court nonetheless notes Plaintiffs' argument at the preliminary injunction hearing that their advocacy requires person-to-person contact because the concept of jury nullification is obscure and does not lend itself well to pithy slogans that can easily be chanted or placed on a placard (and therefore understood from a distance).  Plaintiffs' counsel could not cite this Court to any authority holding that those wishing to advocate complicated or lesser understood concepts receive more solicitude than others when it comes to available channels of communication.  To the contrary, the case law suggests that the government can more easily restrict person-to-person interaction because of its potential for harassment.  *See, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 773–74 (1994).  The Court need not resolve the issue at this time, but only raises it as a matter of potential concern as this case progresses.

succeed in defeating at least Paragraph 1 of the Plaza Order under the strict scrutiny test applied to public forums.

## C.    Irreparable Injury

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."   *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks omitted).   Moreover, the Second Judicial District offers no response to Plaintiffs' irreparable injury argument. Accordingly, the Court finds that Plaintiffs will be irreparably injured absent a preliminary injunction.

## D.    Balancing of Interests

The injury to a plaintiff deprived of his or her First Amendment rights almost always outweighs potential harm to the government if the injunction is granted.   *See Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)*; ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999).   And again, the Second Judicial District offers no response to Plaintiffs' argument that the balance of interests tips in their favor.   Accordingly, the Court finds that the balance indeed tips in Plaintiffs' favor, although the Court will issue the narrowest injunction possible so that the Second Judicial District is not unduly restrained in its ability to maintain safety and proper judicial functioning.   (*See* Part III.F, *infra*.)

## E.    Public Interest

Finally, as with irreparable injury and balancing of interests, it is almost always in the public interest to prevent a First Amendment violation.   *See Awad*, 670 F.3d at

1132; *Johnson*, 194 F.3d at 1163.  The Second Judicial District does not argue

otherwise.  The Court therefore finds that a narrowly drawn injunction would be in the

public interest.

## F.      Scope of Injunctive Relief

The Court will enter a preliminary injunction in favor of Plaintiffs.  However, the

Court will not grant an injunction as broad as Plaintiffs' counsel requested at the

preliminary injunction hearing.  Plaintiffs' counsel requested an injunction stating that

their message and form of advocacy is protected speech, supposedly to protect against

any other government agency that might try to silence them.  But the Court cannot say

(on this record at least) that Plaintiffs' message and form of advocacy is always

protected speech under all circumstances.  In addition, an injunction must run against a

party—this Court cannot enter an injunction against the world at large.  *See, e.g.*, Fed.

R. Civ. P. 65(d)(2) (describing persons bound by an injunction).  If Plaintiffs believe that

a particular government agency is likely to attempt to silence them, they need to join

that agency as a party and satisfy the preliminary injunction as against that agency.[8]

Further, although Plaintiffs apparently seek to strike down the entire Plaza Order

as unconstitutional, the Court will limit its injunction only to certain portions of the Plaza

Order.  As counsel for the Second Judicial District pointed out at the preliminary

injunction hearing, the Plaza Order applies both inside and outside the Courthouse, but

---

[8] Plaintiffs' counsel expressed some concern that the Denver District Attorney's office had been involved in the arrest of Brandt and Iannicelli and that the DA's office might continue to pursue similar prosecutions.  But Plaintiffs have not joined the DA's office as a party, and in any event, in light of Denver's stipulation with Plaintiffs, it is questionable whether the Denver Police Department would execute any arrest warrant based on Plaintiffs' activities.

Plaintiffs have only challenged its restrictions outside the Courthouse.  Accordingly, the Court will not disturb the Plaza Order as it operates inside the Courthouse.

In addition, the Court notes the Landscaping and Gravel Area in the East Restricted Area.  Although no party discussed the scope of a potential injunction in these specific areas, the Court assumes for present purposes that Denver did not intend its public forum stipulation to authorize Plaintiffs to tramp through the Landscaping or the Gravel Area, both of which are ultimately designed for the Courthouse's security.  The Court therefore will not enjoin the operation of the Plaza Order as it applies to the Landscaping and Gravel Area.

The Court also notes that Plaintiffs have specifically alleged their intent to distribute and discuss the two pamphlets attached to their original complaint, "Fresh Air for Justice" (ECF No. 1-3) and "Your Jury Rights: True or False?" (ECF No. 1-4).  At the preliminary injunction hearing, counsel for Plaintiffs reemphasized that these two pamphlets form the basis of what they wish to discuss.  The Court will therefore limit its injunction to distribution of those specific pamphlets and oral advocacy of the message contained in those pamphlets.

Finally, only Paragraph 1 of the Plaza Order is truly at issue here.  Plaintiffs have not challenged the Second Judicial District's authority to prevent obstruction of the entryways (Paragraph 2), to prohibit the erection of structures (Paragraph 3), or to restrict sound amplification equipment (Paragraph 4).  Thus, the Court will limit the injunction to Paragraph 1 of the Plaza Order.[9]

---

[9] A party awarded a preliminary injunction normally must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiffs' and Denver's Stipulation (ECF No. 23) is ACCEPTED and shall be treated as if an order from this Court;

2. Plaintiffs' Motion for Preliminary Injunction (ECF No. 2) is GRANTED; and

3. The City and County of Denver, its police chief, Robert C. White, in his official capacity, and the Second Judicial District (including their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with any of them) (collectively, "Defendants") are PRELIMINARILY ENJOINED as follows (all capitalized terms bear the respective meanings assigned above):

    a. Save for any Plaintiff physically located on the Landscaping or Gravel Area, Defendants shall not enforce Paragraph 1 of the Plaza Order against any Plaintiff (including any FIJA member) physically located in the Restricted Area to the extent he or she is otherwise lawfully seeking to distribute and/or orally advocate the message contained in the pamphlets titled "Fresh Air for Justice" and/or "Your Jury Rights: True or False?"

---

have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Tenth Circuit has held that "a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm."  *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (internal quotation marks omitted).  The Second Judicial District has not put forth any evidence of a likelihood of harm, nor has it argued that Plaintiffs should be required to post a bond.  Having considered the issue *sua sponte*, the Court determines that a bond is unnecessary in light of the lack of likely harm to the Second Judicial District, and in light of the nature of the case.  *Cf.* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 n.29 (3d ed., Apr. 2015 update) (citing public rights cases where the bond was excused or significantly reduced).

b.    To the extent consistent with the foregoing prohibition, Defendants remain

free to enforce Paragraphs 2–4 of the Plaza Order.

Dated this 25th day of August, 2015.

BY THE COURT:

William J. Martinez
United States District Judge