**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-1775-WJM-MJW

ERIC VERLO,
JANET MATZEN, and
FULLY INFORMED JURY ASSOCIATION,

    Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, COLORADO, a municipality,
ROBERT C. WHITE, in his official capacity as chief of police for Denver, and
CHIEF JUDGE MICHAEL MARTINEZ, in his official capacity as chief judge of the Second Judicial District,

    Defendants.

## ORDER DISCHARGING ORDER TO SHOW CAUSE

Plaintiffs Eric Verlo, Janet Matzen, and the Fully Informed Jury Association ("FIJA") (collectively, "Plaintiffs") bring this lawsuit to establish that they have a First Amendment right to distribute and discuss literature regarding jury nullification in the plaza outside of Denver's Lindsey-Flanigan Courthouse ("Courthouse Plaza" or "Plaza"). (ECF Nos. 1, 13-1.) On August 25, 2015, this Court issued an order ("Order") granting Plaintiffs' motion for a preliminary injunction and enjoining Defendants from interfering with Plaintiffs' peaceful distribution of certain jury nullification literature on the Plaza. (ECF No. 28 at 25–26.)

The following day, Plaintiffs moved for an order to show cause why Defendant Robert C. White, in his official capacity as Denver chief of police, should not be held in contempt of this Court's Order ("Show Cause Motion"). (ECF No. 29.) Plaintiffs' Show

Cause Motion represented that they,

> along with others, were in the [Plaza] this morning, peacefully passing out jury nullification literature. . . .
>
> At approximately 10:00 a.m., a cadre of Denver police officers swarmed into the group of pamphleteers and began seizing items from them.  The items seized included but are not limited to the following:  All literature regarding jury nullification including about 1,000 pamphlets, a small shade shelter, a table, four chairs, buckets, a cooler, signs and other items.
>
> While on-scene, the police attempted to take personal property such as purses, computers, backpacks and other items. . . .

(Id. ¶¶ 3–5.)  Defendant White and Defendant City and County of Denver (jointly, "Denver") responded with video appearing to show police officers seizing a shade canopy, table, chairs, and similar items, but apparently not seizing material such as pamphlets or signs.  (*See* ECF No. 31.)  Given the significant differences in Plaintiffs' and Denver's respective accounts of the incident, this Court granted the Show Cause Motion and ordered the parties to appear for an evidentiary hearing on September 1, 2015.  (ECF No. 34.)

Having considered the evidence presented at that hearing, and having considered the parties' written and oral arguments, the Court finds for the reasons explained below that Plaintiffs have not met their burden to show that Denver violated this Court's Order.  Accordingly, the Court finds no contempt and the order to show cause is discharged.

## I.  THE SCOPE OF THE ORDER

The Court begins by reviewing certain portions of its August 25, 2015 Order that

are particularly relevant here.

First, before the Order was entered, Plaintiffs and Denver filed a stipulation ("Stipulation") containing, among other things, an agreement that the Courthouse Plaza "is a public forum and any content-based regulations must be narrowly drawn to effectuate a compelling state interest and reasonable time, place and manner regulations." (ECF No. 23 ¶ 1.) Moreover, Denver, "through its police or sheriff department," stated that it "will not arrest or otherwise charge Plaintiffs for handing out literature regarding jury nullification so long as Plaintiffs do not violate Colorado law or Denver's Revised Municipal Code when they are handing out their literature." (*Id.* ¶ 2.) Finally, Plaintiffs and Denver "agree[d] to this Stipulation being entered as an order of the Court." (*Id.* ¶ 5.) In the Order, this Court accepted the Stipulation and stated that it "shall be treated as if an order from this Court." (ECF No. 28 at 25.)

Second, the Order enjoined all Defendants from enforcing certain portions of what the Court referred to as the "Plaza Order," a Second Judicial District administrative order prohibiting essentially all expressive activity in a designated area immediately outside the Lindsey-Flanigan Courthouse ("Restricted Area"). (*See id.* at 6–9.) Specifically, this Court enjoined enforcement of Paragraph 1 of the Plaza Order (addressing expressive activities) against "any Plaintiff (including any FIJA member) physically located in the Restricted Area to the extent he or she is otherwise lawfully seeking to distribute and/or orally advocate the message contained in [two specific jury nullification pamphlets]." (*Id.* at 25.) The Court did not enjoin Paragraphs 2–4 of the Plaza Order (addressing obstruction of entryways, erection of structures, and sound amplification equipment). (*Id.* at 24, 26.)

## II.  FINDINGS OF FACT

In light of all the evidence received at the Show Cause Hearing on September 1, 2015, the Court finds as follows.

### A.     The Setting

Sometime before 10:00 a.m. on August 26, 2015, Plaintiff Eric Verlo and others began a demonstration on the Courthouse Plaza, although just outside the Plaza Order's Restricted Area.  The demonstration included a jury nullification message.  Some demonstrators were handing out jury nullification pamphlets and presumably attempting to discuss jury nullification with passersby.  Some demonstrators held "Ask me about jury nullification" signs.  Someone had set up a small folding table, placed jury nullification pamphlets on it, and hung a banner from it with a jury nullification message.

The demonstration also included other messages.  One demonstrator held a flag displaying the initials "FTP," short for "Fuck the Police."  Another demonstrator held a flag emblazoned with the word "Occupy."  Plaintiff Verlo wore an Occupy t-shirt.  Certain demonstrators were sitting on overturned five-gallon buckets on which were painted a clenched red fist, another symbol of the Occupy movement.  Someone had set up a collapsible shade canopy from which hung an Occupy banner.  On one side of the shade canopy were the letters "DEATH P."  In light of the testimony of one of the demonstrators, Dr. Nazli McDonnell, who stated at the Show Cause Hearing that the demonstrators were "in the process of putting up letters on the canopy to support our cause" when the police arrived, the Court presumes that "DEATH P" was an unfinished reference to the death penalty.  On that day, the Dexter Lewis death penalty trial was

continuing inside the Lindsey-Flanigan Courthouse.

The Court also notes a certain man under the shade canopy wearing a white t-shirt with "If not us, who? If not now, when?" written on the back of his shirt.  As will become clear shortly, this man assumes somewhat outsized importance in the events that follow.  McDonnell testified, however, that she did not know who the man was, and Plaintiffs' counsel intimated that no other demonstrator knew this man's identity.  For lack of a better name, then, the Court will refer to this man as the White T-Shirt Man.

**B.     The Arrival of the Police**

As captured on numerous security camera videos and on a video made by a police officer with a handheld video camera, ten to fifteen Denver Police officers approached the demonstrators' location at 10:06 a.m.  These officers had assembled at the direction of Denver Police Commander Antonio Lopez, who believed that Denver's Municipal Code required the demonstrators to have a permit to erect structures such as the shade canopy.

Among the officers was Lieutenant Mark Drajem, who first made contact with the demonstrators and asked one of them, Caryn Sodaro, about the ownership of the shade canopy.  Sodaro responded that "nobody and everybody" owned it.  Verlo then began insisting to Drajem that the police were interrupting their assembly and that the demonstrators had a right to be there.  Drajem responded, "Your structure cannot be here."

Drajem next asked if anyone had "a permit for this."  Verlo answered that the First Amendment and this Court's Order permitted the demonstrators to place their items there.  Drajem replied, "If nobody has a permit, we're going to have to take this.

If nobody wants to take it down, we will take it down." Verlo and others continued to argue with Drajem, who eventually gave the demonstrators sixty seconds to "take this down."

During those sixty seconds, Drajem announced, "You are free to have your assembly. You cannot have a structure erected without a permit." Drajem also told demonstrators that they would be arrested if they interfered with the police's efforts to remove the "structure." Immediately after that, the White T-Shirt Man approached the folding table with jury nullification pamphlets and took several of those pamphlets.

**C.    Removal of the "Structures"**

At the end of Drajem's appointed sixty seconds, police officers moved into position beside the four legs supporting the shade canopy. One demonstrator, McDonnell, stood with her back directly against one of those legs with her hands behind her, holding onto the leg itself. A police officer approached her and asked something not audible on any video recording. Her response, however, was, "I'm just standing here." The police officer then asked her to move, to which she responded, "You can ask me to move. I don't have to move. . . . I'm just standing here. I'm just standing here." A police officer gently pushed McDonnell away from the canopy leg and various police officers then worked together, without interference, to collapse the canopy.[1]

At this point, the demonstrators became extremely vocal toward the police, repeatedly shouting obscenities and, in the case of one individual, approaching officers

---

[1] At the Show Cause Hearing, McDonnell testified that she had "put [her] arms around" the canopy leg as a demonstration of ownership. The video evidence, which shows this entire incident from less than three feet away, shows no expression of ownership. At best, McDonnell appears to be attempting a small show of civil disobedience.

closely and shouting in their faces in an apparent attempt to provoke some sort of violent response. Throughout this, the police demonstrated commendable restraint.

Having collapsed the canopy, police officers laid it on the ground several feet away. Corporal Lisa Aitken-Nelson and an unidentified officer then moved to either end of the folding table on which a jury nullification banner had been hung. The unidentified officer removed a purse and laptop bag from the table and set those items carefully on the ground. Aitken-Nelson, on her end of the table, removed a bullhorn, set it on the ground, then collected a number of pamphlets sitting on the table and placed those on the ground under the bullhorn, to prevent them from blowing away. Aitken-Nelson removed the banner and handed it to demonstrator Sodaro. Finally, the unidentified officer and another unidentified officer tipped the table on its side, collapsed its legs, and carried it to the same area where the collapsed shade canopy was lying on the ground.

From here, the police officers moved to seize various other items, including folding chairs and the overturned Occupy buckets. Eventually the police took away the bullhorn under which Aitken-Nelson had set the pamphlets. The White T-Shirt Man immediately collected the pamphlets from the ground. He later put at least some of those pamphlets into his pocket.

At 10:14 a.m., the police gathered around the property they had seized, picked it up, and walked away with it toward a police building. Thus, the entire incident lasted about eight minutes. Denver Police did not cite or arrest anyone on account of this incident.

As the police walked away, certain demonstrators—still holding their flags and

"Ask me about jury nullification" signs—continued their demonstration. Other demonstrators shadowed the police, continuing to shout obscenities.

**D.     The Seized Property**

According to the Denver Police's property log, which was admitted into evidence without objection as Exhibit D at the Show Cause Hearing, the Denver Police seized the following items:

- the Occupy buckets;
- the folding table;
- the bullhorn;
- the Occupy banner that had been hanging from the shade canopy;
- the green jug;
- four folding chairs;
- the shade canopy; and
- a hand truck.

In their briefing preceding the Show Cause Hearing, Plaintiffs claimed that "[t]he police did not inventory everything seized in Exhibit D, as will be testified by the persons who were witnesses." (ECF No. 35 at 2.) The only such testimony, however, was from McDonnell, who claimed that the police also seized a black "FTP" flag. When faced with a video showing a demonstrator in constant possession of a black FTP flag, even after the police's departure, McDonnell insisted "we had more than one flag."

Having thoroughly reviewed the video evidence, the Court can identify a total of three flags (apart from the banner hanging from the shade canopy): one black FTP flag, which remained constantly in the possession of a particular demonstrator; one black

8

Occupy flag, which remained constantly in the possession of another demonstrator; and a third black flag with no clearly visible message, apparently attached to a bicycle parked several feet away from where the demonstrators had set up their assembly. Denver Police did not interfere with any of these flags at any time. Accordingly, the Court finds that the only property seized by Denver Police was the property logged in Exhibit D.

Two days after its seizure, Verlo claimed the seized property, and all of it was released to him save for the green jug. Police came to suspect the jug had oil or gas in it and therefore transferred it to the Fire Department for proper disposal.[2]

### III.  CONTEMPT STANDARD

"To prevail in a civil contempt proceeding, the plaintiff has the burden of proving, by clear and convincing evidence, that a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order." *Reliance Ins. Co. v. Mast Const. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998) (citation omitted) ("*Reliance II*").  "Any ambiguities or omissions in the order will be construed in favor of [the person charged with violating the order]." *Reliance Ins. Co. v. Mast Const. Co.*, 84 F.3d 372, 377 (10th Cir. 1996) ("*Reliance I*").

### IV.  ANALYSIS

**A.     Violation of the Terms of the Order**

As noted in Part I, *supra*, this Court's Order contained two sets of prohibitions:

---

[2] McDonnell disputes that the jug had oil or gas in it. She testified that the jug had been filled from a water spigot at her house. This appears to be a non-issue. No party suggests any potentially violent purpose.

those adopted by way of the Stipulation, and those of the Injunction itself. The Court finds that Denver did not violate the specific terms of the Injunction. The Injunction forbids Denver from prohibiting any Plaintiff physically located in the Plaza Order's Restricted Area from "otherwise lawfully seeking to distribute and/or orally advocate the message contained in the pamphlets titled 'Fresh Air for Justice' and/or 'Your Jury Rights: True or False?'" (ECF No. 28 at 25.) Plaintiffs' demonstration on August 26 took place just outside the Restricted Area. Accordingly, the Injunction is not directly at issue here.[3]

The Court further finds that Denver did not violate the specific terms of the Stipulation. Although the Stipulation covers the entire Courthouse Plaza (and therefore encompasses the area where the demonstrators assembled), the Stipulation only prohibits Denver from "arrest[ing] or otherwise charg[ing] Plaintiffs for handing out literature regarding jury nullification." (ECF No. 23 ¶ 2.) Denver did not arrest or charge any Plaintiff for handing out jury nullification literature. Thus, Plaintiffs lack clear and convincing evidence that Denver violated the actual terms of the Stipulation.

## B. Violation of the "Spirit" of the Order

Parties are expected to comply with both "the letter and the spirit" of a court's orders. *See, e.g.*, *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949); *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954–55

---

[3] In emphasizing that Plaintiffs' demonstration took place outside the Restricted Area, the Court does not mean to suggest that the Restricted Area is the *only* place where Plaintiffs may freely advocate their message. This Court narrowed the Injunction to the Restricted Area because that was the only place where the Second Judicial District intended to enforce expressive activity restrictions.

(9th Cir. 2014); *Cason v. Cason*, 637 S.E.2d 716, 718–19 (Ga. 2006). In a contempt proceeding, this principle is somewhat at odds with the requirement that "[a]ny ambiguities or omissions in the order will be construed in favor of [the person charged with violating the order]." *Reliance I*, 84 F.3d at 377. In this case, however, the Court need not resolve this tension because, as explained below, Plaintiffs have failed to present clear and convincing evidence of any violation of the "spirit" of the Order.

    1.    <u>Seizing Jury Nullification Materials</u>

The Court convened the Show Cause Hearing particularly to resolve Plaintiffs' accusations that Denver Police had seized jury nullification pamphlets and signs. Neither the Injunction nor the Stipulation specifically prohibits such seizure. However, the Court does not hesitate to say that seizing jury nullification pamphlets, or seizing signs such as the handheld signs visible in the various videos, would most clearly violate the spirit of the Order absent something like an immediate and compelling public safety justification.

Here, Plaintiffs failed in their burden to present clear and convincing evidence that the police seized jury nullification pamphlets. Plaintiffs' strongest argument, as summarized by their counsel, is that "[t]he chaotic nature of the scene was such that no one can swear that they actually saw any police officer take the jury nullification literature, however when the raid was concluded, there was no literature left to distribute and new literature had to be printed." (ECF No. 35 at 2.) Even if true, the security camera and police videos consistently show the White T-Shirt Man, not the

police, collecting the pamphlets.[4] When counsel for Denver brought the relevant video segments to the attention of the Court and the witnesses, Plaintiffs had no response. Plaintiffs did not, for example, counter with other video segments showing police seizing pamphlets.

Even more tellingly, Plaintiffs did not respond with video of their own. The police and security camera videos reveal that nearly every demonstrator (including Verlo) and numerous bystanders were recording the incident with their cell phones or other devices. The Court must assume that Plaintiffs reviewed at least the videos they themselves created, and that Plaintiffs would have submitted those videos if they showed the police seizing pamphlets. That Plaintiffs did not do so strongly suggests that even their own video does not support their version of events.

The case is likewise regarding Plaintiffs' signs. All of Plaintiffs' witnesses (including those whose testimony was accepted by way of affidavit) stated that the police took a cardboard "Ask me about jury nullification" sign, but the video evidence shows the police setting signs aside (later to be picked up by demonstrators), and the police property log says nothing about a seized sign. Moreover, when the police departed, demonstrators continued to hold up "Ask me about jury nullification" signs.

Thus, Plaintiffs fall well short of proving by clear and convincing evidence that Denver Police seized jury nullification pamphlets or signs.[5]

---

[4] Although Plaintiffs appear to disavow any knowledge of who the White T-Shirt Man is, no one has stated or even suggested that he was somehow affiliated with law enforcement.

[5] Plaintiffs also argue that seizing the Occupy banner was a First Amendment violation. (ECF No. 35 at 2.) This was the banner hanging from the shade canopy, and police witnesses say that they seized it because no one would claim it, although it was released to Verlo when he

2.      Intent to Harass, Intimidate, or Retaliate

Plaintiffs also argue that Denver violated the injunction because the entire incident was allegedly motivated by an intent to harass Plaintiffs and/or retaliate against them for exercise of their rights. Plaintiffs' argument appears to be that a party can be in contempt when the party does not actually violate a Court order but takes actions with the intent to dissuade others from exercising rights granted under that order. Such a proposition seems reasonable on its face, although Plaintiffs have not pointed this Court to any cases in which such a theory has been endorsed or entertained. But the Court need not resolve whether this form of contempt actually exists because Plaintiffs again fail in their burden to present clear and convincing evidence of it.

Plaintiffs' primary focus here is Denver's purported legal justification for moving in and seizing the "structures." In response to Plaintiffs' Show Cause Motion, Denver stated that its police officers had been acting to enforce Denver Revised Municipal Code §§ 49-246, 49-247, and 49-248, which relate to "encumbrances" on public property. (ECF No. 31 at 3–4.) In full, those sections read as follows:

> **§ 49-246.** The manager of public works or the manager's designee (hereinafter in this article, "manager") is authorized to remove or to order the removal of any article, vehicle or thing whatsoever encumbering any street, alley, sidewalk, parkway or other public way or place (any such thing hereinafter in this article to be called an "encumbrance"). The manager may prescribe appropriate methods, specifications, placement and materials for encumbrances in the public right-of-way.

---

claimed it two days later. But even assuming *arguendo* that seizing the Occupy banner was a First Amendment violation, the Court does not find that this seizure violated the spirit of the Order. Plaintiffs sought a preliminary injunction specifically because they feared prosecution for handing out jury nullification literature. The Court intentionally tailored its Order to that concern.

13

> **§ 49-247. (a)** If the manager orders the removal of an encumbrance which has previously been permitted or is legally in place in the right-of-way and said encumbrance is not removed within a reasonable time after notice to the owner or person in charge thereof under, such time to be specified in the notice, or if the owner or person in charge cannot be readily found for the purpose of serving such notice, the manager shall cause the encumbrance to be removed.
> **(b)** If the manager orders the removal of an encumbrance which has not previously been permitted, or is not legally in the right-of-way, said encumbrance shall be immediately removed by the owner or the manager may immediately remove said encumbrance.
> **(c)** Notwithstanding the above, the manager may, without notice to the owner, immediately remove any non-permitted, illegal encumbrance without notice to the owner.
>
> **§ 49-248.** It shall be the duty of all members of the police department to report to the manager such encumbrances and to remove the same in accordance with the provisions hereof.

These Code sections do not appear to vest the Denver Police with any independent authority to enforce their provisions. Rather, the manager of public works makes the decision whether to remove an "encumbrance," and then the police carry out that decision.

At the Show Cause Hearing, Commander Lopez (the Denver Police officer who ordered his officers to investigate the demonstrators' "structures") admitted that Denver Police are not the manager of public works's "designee" under these Code sections and that he did not consult with the manager or his designee before taking action. He also stated that all of the seized property was nonetheless justifiably taken into police custody as "abandoned" or "unclaimed" because no demonstrator would take

ownership.

Lieutenant Drajem had a somewhat different story, however. He testified that only the bullhorn was seized as "abandoned." Everything else was seized in violation of the above-quoted Municipal Code sections, which Drajem understood to create a permit requirement for anyone intending to erect "encumbrances" on public land. Corporal Aitken-Nelson, for her part, testified that she believed they were removing property both as abandoned and as a violation of the Municipal Code.

Plaintiffs' counsel cross-examined all of these officers by pointing out that the relevant Municipal Code sections arguably do not apply, and emphasizing that the officers could not have reasonably seen the property as "abandoned" in the traditional sense because it was obviously in use. Plaintiffs' counsel spent significant time on Sodaro's "nobody and everybody" response when Drajem asked about ownership. Plaintiffs' counsel characterized this as "kind of a communistic concept" and repeatedly sought the officers' admission that "nobody and everybody" is just another way of saying "we all own it."[6]

Plaintiffs' counsel's point appeared to be that the police could not keep their story straight amongst themselves, and that they were actually changing their justification (*i.e.*, from removing an "encumbrance" to collecting "abandoned" property) solely for purposes of the Show Cause Hearing. The Court understands Plaintiffs' argument to be that this apparent after-the-fact rationalization, and the police's unwillingness to accept the demonstrators' ownership claims, is evidence that enforcing

---

[6] McDonnell testified that, in fact, the shade canopy had been provided by the ACLU of Colorado Springs.

the Municipal Code was a pretext and that the police actually had an intent all along to disrupt the demonstrators' assembly and seize their property—supposedly in retaliation for the demonstrators' exercise of the right to distribute jury nullification literature.

The problem for Plaintiffs, however, is that they lack clear and convincing evidence to support this theory. Indeed, much of the evidence goes the other way. The Court is not convinced that a reasonable police officer should interpret "nobody and everybody" to mean "we all own it." It is at least as reasonable to interpret the answer as an expression of intent not to give the police any information or otherwise cooperate with them. Moreover, Drajem invited the demonstrators to take down the canopy themselves and gave them ample opportunity to do so. This suggests the opposite of a premeditated intent to seize the property no matter what.

As for the various police witnesses' arguably shifting and inconsistent justifications for the seizure, the Court does not see clear and convincing evidence of an improper state of mind. A police officer generally familiar with Municipal Code §§ 49-246, 49-247, and 49-248 could reasonably conclude that unpermitted "structures" on public land are unlawful. At worst, the police officers displayed an inattention to specified enforcement procedures.

Finally, Denver's previous actions in this case undercut at any claim that its police officers had a retaliatory or harassing purpose. When Plaintiffs moved for their preliminary injunction, Denver responded by taking Plaintiffs' side against the Second Judicial District. Denver stipulated that the Courthouse Plaza was a public forum, that Plaintiffs have a right to distribute their literature, and that Denver would not enforce the Second Judicial District's Plaza Order. Indeed, Commander Lopez was *Plaintiffs'*

*primary witness at* the Preliminary Injunction Hearing, obviously called to rebut the Second Judicial District's claim of a need to restrict expressive activities on the Courthouse Plaza. Commander Lopez forthrightly described his officers' continual toleration of First Amendment activities, essentially without incident, for the five years that the Courthouse has been operating. The Court can see no reason why, after choosing to support Plaintiffs' claims and assertions at the Preliminary Injunction Hearing, Denver or any of its police officers (especially Commander Lopez, the relevant decisionmaker here) would suddenly turn about and form a motive or intent to harass or retaliate against individuals whom Denver has previously stated have the First Amendment right to the expressive activity in the relevant area.

Thus, clear and convincing evidence does not exist to support Plaintiffs' contention that Denver acted with a motive to harass, intimidate, or retaliate against Plaintiffs for exercising the rights granted to them in this Court's Order.

## V. CONCLUSION

For the reasons stated above, the Court finds no contempt of its Order. The Order to Show Cause is therefore DISCHARGED.[7]

---

[7] A parting word on rhetoric: Plaintiffs describe the Denver Police involved in this incident as "jack-booted thugs." (ECF No. 29 ¶ 10.) "Jack-booted," of course, is often intended as an implied reference to totalitarianism, especially Nazi totalitarianism. Although Plaintiffs naturally feel upset about the police's actions, the Court commends to them the phrase popularized by former *Daily Show* host Jon Stewart: "I disagree with you, but I'm pretty sure you're not Hitler."

Dated this 3rd day of September, 2015.

BY THE COURT:

William J. Martinez
United States District Judge